IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CHICAGO INSURANCE COMPANY,

        Plaintiff,

v.                                  CIVIL  ACTION  NO.  3:09-0659

HEALTH CARE INDEMNITY, INC.,

        Defendant.

MEMORANDUM OPINION AND ORDER

Pending is Defendant, Health Care Indemnity Inc.'s Motion for Partial Summary Judgment (Doc. 28).  For reasons explained below, the Court **DENIES** that motion

**Background**

This case concerns two insurers of David McNair, who was pursued by over 100 plaintiffs in state court medical malpractice actions.  Plaintiff, Chicago Insurance Company (CIC), initiated this suit to recover from Defendant, Health Care Indemnity, Inc. (HCI), various defense and settlement costs made by CIC in an effort to resolve the underlying cases filed against McNair.  HCI filed a number of counter-claims, asserting that it and not CIC was entitled to reimbursement for expenses related to the defense of McNair.  HCI filed the instant motion for partial summary judgment seeking a declaration on the proportion of costs each party will bear, and on it's counterclaims.  CIC maintains that HCI's proposed cost distribution is unfounded and claims that a motion on the counterclaims is premature, as discovery has not yet been completed.

I.      **The Underlying Litigation**

The underlying litigation consisted of approximately 107 lawsuits filed in the Circuit Court of Putnam County, West Virginia.  Each arose from surgeries performed by Dr. John King, an orthopedic surgeon at Putnam General Hospital in Hurricane, West Virginia in the latter part of 2002 and the first half of 2003.  David McNair acted as a surgical technician to Dr. King on many of the procedures at issue in the King Litigation.  Also involved in the lawsuits were Putnam General Hospital and HCA, Inc. (HCA).  The plaintiffs claimed that Putnam General Hospital and HCA were each negligent in their credentialing of Dr. King.  HCI is an indirect wholly owned subsidiary of HCA, which provided insurance coverage and a defense to HCA, the hospital, and McNair, as an employee of the corporate entities.  (It did not provide coverage or defense to Dr. King who was not an insured under the policy).  Plaintiff, CIC, insured only McNair.  In combination, the two insurance companies successfully settled the claims against McNair.  There is some contention, however, about the relative roles played by each company.

In the summer of 2004, HCI retained Thomas J. Hurney, a Charleston, West Virginia attorney, to defend McNair in the underlying litigation.  In February 2005, CIC agreed to contribute to the cost of McNair's representation by Mr. Hurney, recognizing that he was already working on the defense.  Initially, CIC agreed to contribute 50 percent of the costs of representation.  CIC sent its own formal reservation of rights letter to McNair on February 27, 2005.

On or about April 2, 2007, the underlying plaintiffs made a written global settlement demand for $5.5 million in exchange for release of all plaintiffs' claims against McNair.  On May 17, 2007, CIC sent a letter to HCI explaining its understanding of the relevant obligations of the insurers.  This letter claimed that CIC was only obligated to contribute 1/11th of McNair's settlement based on its

pro-rata share of coverage.  CIC claims that HCI never disputed that it would be responsible for 10/11ths of the relevant settlment costs.  CIC further claims that HCI proposed that the two insurers enter a risk transfer agreement, where HCI would assume all of CIC's coverage obligations in exchange for a payment from CIC.  According to CIC, it, HCI, and McNair continued to negotiate the terms of the proposed risk transfer agreement until the fall of 2007, when HCI ceased communication with CIC.

On January 30, 2008, Mr. James Murray, an attorney representing CIC, wrote a letter to HCI claiming that the 50/50 share of the defense fees and costs, paid to that date, resulted in an overpayment by CIC.  CIC claimed responsibility for at most a 1/11th share.  CIC requested reimbursement from HCI in the amount representing the difference between the 50 percent CIC had paid and its 1/11th share.  Mr. Murray advised that CIC would not contribute to further defense costs of McNair until it received its claimed reimbursement.

On February 8, 2008 HCI settled approximately 70 of the claims in the underlying litigation for $55 million, collectively.  (These claims were referred to as the "Curry" claims, as each of the plaintiffs was represented by a single attorney named Curry.)  This was the largest group of plaintiffs and the settlement was on behalf of the institutional defendants (Putnam General Hospital and HCA) as well as McNair as their employee.  On February 15, 2008 HCI informed Mr. Hurney of this settlement.  Mr. Hurney, in turn, informed CIC, which had not been privy to the settlement negotiations. The February 19th letter from Mr. Hurney advised not only of the HCI settlement but also referenced a $4.75 million dollar settlement demand for resolution of all claims against McNair by all of the plaintiffs (including the Curry plaintiffs).  Apparently, CIC had requested that Mr. Hurney forward this demand to HCI.  The letter stated:

> I am now advised that HCI has reached a settlement on behalf of Putnam General Hospital and its parent corporations, and David McNair, with the plaintiffs represented by Curry & Tolliver.  I do not know the details of the settlement, but I am told by Mr. Curry that the settlement may not include any claim for which Mr. McNair may have insurance.
>
> With respect to the plaintiff's demand of $4.75 million, I attach their letter to you. . . . The demand by Mr. Curry is made on behalf of all plaintiffs, including those represented by Druckman and Lindsay, and is specifically made to David McNair to the extent he has insurance with Chicago Insurance Company.  A specific condition of the demand, as reflected in Mr. Curry's separate settlement with HCI is that it did not include HCI.

Feb. 19, 2008 Letter, Pl.'s Ex. C (Doc. 30-1).  The letter went on to explain, "I cannot comply with your request for two reasons.  First, HCI has already apparently reached some settlement with plaintiff.  Second, the offer was based solely on the insurance available to McNair through Fireman's Fund/Chicago Insurance Company."  *Id.*.

A February 21, 2008 email from Hurney reflected that a settlement of all claims against McNair had been reached. It read,

> I am pleased to advise all that the plaintiffs have agreed to a settlement of all claims against David McNair by all plaintiffs (Curry & Tolliver, Druckman & Lindsay) for $2.5 million dollars payable by Chicago Insurance Co. . . . We agreed that the settlement must result in David McNair's *complete* dismissal from the actions, including any attempt by any other party to make claims against him.

February 21, 2008 Email, Pl.'s Exh. D (Doc. 30-1) (emphasis in original).

Both HCI and CIC claim that the other operated in bad faith during the representation of David McNair.  Each claims that the other ceased communication..  HCI claims that its initial

-4-

settlement was the one which resolved the majority of the claims and that most of the money paid by CIC in the subsequent settlement was gratuitous as the Curry claims against McNair were already settled. CIC argues that it was the one who obtained a release of McNair from the pending litigation, as the HCI settlement left him as a defendant in each of the pending lawsuits.

## II.    The Relevant Policies

The HCI policy at issue is Policy number HCI-10101. HCI claims that the applicable policy period is from January 1, 2002 to January 1, 2003. (CIC claims that the applicable HCI policy period runs through 2003.) The CIC policy at issue is 44-2010129. Two policy periods are applicable, from April 5, 2002 until April 5, 2003 and from April 5, 2003 until April 5, 2004. Both the HCI policy and the CIC policy contain an "other insurance" provision, specifying how their coverage will be affected by another applicable policy. The HCI provision states,

> If other insurance not afforded the Company is available to any Insured covering an occurrence hereunder, the insurance afforded hereunder shall be excess of and not contribute with such other insurance. Amounts collectible under a self-insured trust plan or any other self-insured program are other insurance for the purposes of this policy. This Article VI, Paragraph 7, does not apply to excess Insurance written specifically to be in excess of this policy. Nothing contained herein shall be construed to make this policy subject to terms, conditions, and limitations of other insurance.

Health Care Indemnity Inc. Comprehensive Health Care Liability Policy at 14, Pl.'s Ex. F (Doc. 34-1). For its part, the CIC policy provides,

> If there is other valid insurance (whether primary, excess, contingent or self-insurance) which may apply against a loss or claim covered by this policy, the

> insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance. . . .
>
> When both this insurance and other insurance or self-insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the loss or defense costs than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability or all valid and collectibles insurance against such loss.  Subject to the foregoing, if a loss occurs involving two or more policies, each of which provides that its insurance shall be excess, each will contribute pro rata.

Chicago Insurance Company Medical Professional Liability Occurrence Insurance Policy, Pl.'s Ex. G (Doc. 34-1).

HCI argues that only its policy contains a true excess coverage clause.  As such, it contends that its policy should be considered excess to that provided by CIC and only contribute to costs once they exceed the CIC limit.  For its part CIC argues that the excess insurance clauses cancel each other out, but that the CIC provision providing for pro-rata apportionment of costs should stand.

## Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most

favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. "Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." *Barwick v. Celotex Corp.* 736 F.2d 946, 963 (4th Cir. 1984).

## Analysis

Defendant's motion for summary judgment contains a request for declaration from the Court that its policy is excess to that of Plaintiff or alternatively a request for declaration that each company pay 50 percent of the costs to which they are mutually obligated. Defendant also requests that the Court rule on Defendant's obligations to a specific settlement amount (of $2.5 million) Plaintiff paid on behalf of David McNair. As explained below, the Court finds that the payment of mutually obligated costs should be pro rata. Additionally, the Court finds that given the current status of discovery it is premature to determine specific cost obligations of the parties.

## I.      Choice of Law

Before beginning a substantive analysis of the claims at issue it is first necessary to determine which state law applies.  Because this Court sits in West Virginia and its jurisdiction is based upon diversity of citizenship, West Virginia choice-of-law rules apply.  *Klaxon Co. v. Stentor Electric Manf. Co.*, 313 U.S. 487, 496 (1941); *Martin v. John Hancock Mutual Life Ins. Co.*, 56 F.Supp.2d 670 (S.D. W.Va. 1999).  The Supreme Court of West Virginia has consistently relied upon the *Restatement (Second) of Conflicts* to determine which state's substantive law applies to the interpretation of insurance contracts.  *Martin*, 56 F.Supp.2d at 672 (citing *Nadler v. Liberty Mut. Fire Ins. Co.*, 424 S.E.2d 256 (W.Va. 1992); *Joy Technologies Inc. v. Liberty Mut. Ins. Co.,* 421 S.E.2d 493 (W.Va. 1992); *Liberty Mut. Ins. Co.  v. Triangle Indus., Inc.,* 390 S.E.2d 562 (W.Va. 1990).

Typically, when an insurance contract is involved, unless there is a specific choice-of-law provision, the law of the place of the insured risk will apply.  *See Restatement (Second) of Conflicts* §§ 192-193.  Here, there is no choice of law provision in either contract and West Virginia is the place of the insured risk.  While this general rule can be overridden if another state has more significant contacts, there is no justification in this case to apply any substantive law other than that of West Virginia, where Putnam General Hospital is located and where David McNair lived and worked at the time of the incidents in question.  *See id* § 188 (listing factors contributing to the significant relationship analysis).

II.      **Both CIC and HCI Should Contribute to Mutual Defense and Settlement Costs Pro Rata**

In its motion for partial summary judgment, HCI argues that its insurance coverage should be considered an excess policy and that CIC's coverage should be considered primary.  Typically, "primary coverage attaches immediately upon the happening of an 'occurrence,' or as soon as a claim is made.  The primary insurer is first responsible for indemnifying the insured in the event of a covered or potentially covered occurrence of claim." *Horace Mann Ins. Co. v. General Star Nat. Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008) (quoting *Gauze v. Reed*, 633 S.E.2d 326, 332 (W. Va. 2006)).  Excess insurance, on the other hand, does not provide initial coverage, but rather provides an additional layer of protection for losses that exceed the limits of primary coverage.  *Id.* "Excess insurance is priced on the assumption that primary coverage exists:  indeed, an excess policy usually requires by its terms that the insured maintain in force scheduled limits of primary insurance." *Id.* (citing *Gauze*, 633 S.E.2d at 332).

Both the HCI and the CIC policies relevant to McNair were capable of providing primary coverage and were presumably priced accordingly.   Neither contains the hallmarks of an excess only policy – most notably lacking any requirement to maintain underlying coverage. *See Id.* at 333 ("the . . . policy is dependent upon the exhaustion of underlying primary liability insurance and this kind of dependance on an underlying liability policy is the hallmark of a true excess policy."). Primary insurance policies, however, may operate differently in conjunction with each other depending upon their other insurance clauses.  These clauses generally exist in the form of either a pro-rata clause, and escape clause, or an excess clause.  "A pro-rata clause 'limit[s] the insurer's liability to its pro rata share of the loss  in the proportion that its policy limits bear[] to the aggregate of available liability coverage." *Id.* at 330 (quoting *State Farm Mut. Auto Ins. Co. v. U.S. Fidelity*

*& Gaur. Co.*, 490 F.2d 407, 410 (4th Cir. 1974).  An escape clause completely disclaims coverage

to the insured when other insurance is available. *Id.* (citing 15 Lee R. Russ & Thomas F. Segalla*,

Couch on Insurance* § 219:5 (3d ed. 2005).  An excess clause provides that the insurer will only be

liable upon the exhustion of the other applicable policy or policies.  *Id.*  Thus, an excess policy

clause can change the nature of insurance coverage, even when the policy would ordinarily provide

primary coverage.  *Id.*  If other insurance clauses can be reconciled they will be enforceable

according to their terms.  *Id.*  In cases where these clauses come into actual conflict a court in this

district has held under West Virginia law that they "should be disregarded inasmuch as they are

mutually repugnant and as against each other cannot be recognized." *Allstate Ins. Co. v. Atl. Nat.

Ins. Co.* 202 F.Supp. 85, 88 (S.D. W.Va. 1962).

　　　　HCI would have this Court read CIC's other insurance clause as a pro-rata clause and its own

other insurance clause as an excess insurance clause.  When a pro-rata clause competes with an

excess coverage clause, West Virginia courts have held that the excess provision should be given

effect and that the pro-rata policy should provide primary coverage up to the available policy limits.

*See Allstate Ins. Co. v. State Auto. Mut. Ins. Co*. 364 S.E.2d 30 (W.Va. 1987).  This holding

represents the majority view, which considers the clauses to be reconcilable.  Coverage does not

overlap because the policy containing the pro-rata clause recognizes its obligations as primary

insurer (and simply provides a mechanism for dividing costs with other primary insurers) while the

policy containing the excess clause disclaims its obligations as primary insurer and declares itself

an excess coverage provider when other insurance is available.  *See* Couch on Ins. 219:51.

　　　　The problem with HCI's interpretation is that it ignores the plain language of CIC's other

insurance provision.  While the CIC provision does contain a pro-rata clause, its application is

limited.  It only applies when a competing policy is interpreted to apply at the same level as the CIC policy (be it primary, excess or contingent).  It follows, and by its own terms is subordinate to, the preceding clause, which explicitly declares that the CIC policy should be considered excess in the presence of other insurance:  "If there is other valid insurance (whether primary, excess, contingent or self-insurance) which may apply against a loss or claim covered by this policy, the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance."  Chicago Insurance Company Medical Professional Liability Occurrence Insurance Policy, Pl.'s Ex. G (Doc. 34-1).  The Court, therefore, must first interpret the two clearly stated excess insurance clauses before determining the applicability of the pro-rata clause.  Because the excess clauses are "mutually repugnant" under West Virginia law, they are necessarily disregarded and both the CIC policy and the HCI policy should be deemed primary coverage of the insured, David McNair.  *See Allstate Ins. Co.* 202 F.Supp. 85.

Having determined that both policies should serve as primary insurance, the next question becomes how to interpret CIC's other insurance clause directing that it contribute a pro-rata share with other policies offering benefits at the same level. While the CIC pro-rata clause is clearly subordinate to the excess clause, it becomes operative when the excess clause is disregarded.  There is nothing to prevent application by its plain terms, and it is easily reconciled with the HCI policy – which does not contain any provision relevant to the situation.  As such, the CIC pro-rata clause should be enforced according to its terms.  The CIC and HCI policy should contribute to the mutually insured costs pro rata.

This Court's holding is consistent with Judge Copenhaver's decision in *American Safety Indemnity Co. v. Stollings Trucking Co.* 450 F.Supp.2d 639 (S.D. W.Va. 2006) ("*Stollings*").

-11-

Interpreting similar other insurance clauses – one containing only an excess coverage provision, the other with an excess coverage provision and subordinate pro-rata provision – Judge Copenhaver held:

> This is not simply a matter of one policy containing a *pro rata* clause and the other containing an excess clause. . . rather, it is a case of two competing excess insurance clauses, one of which says its payout is limited to a pro rata sharing with the other.  Only because the two policies are on par with one another . . . does the Clarendon *pro rata* provision become effective.

*Id.* at 650.  While the insurance provisions at issue in *Stollings* were not identical to those of CIC and HCI, they were similar enough to make Judge Copenhaver's reasoning applicable to this case. By reaching the same result this Court respects the role of *stare decisis* and maintains consistency in this district.


III.    **It Is Too Early In the Proceedings to Determine Which Costs Mutually Obligate the Insurers**

As part of its request for partial summary judgment, HCI argues that it should not have to contribute to any part of the $2.5 million paid by CIC to the Curry plaintiffs, after a settlement payment was made to the same plaintiffs by HCI.  HCI contends both that the payment was gratuitous and that the settlement agreement of $2.5 million was the result of a selective tender, only to CIC.  As the recited facts indicate, the circumstances surrounding the settlements in the underlying litigation were complicated.  Both CIC and HCI blame the other for a breakdown in communication, and argue that it was they who deserve credit for obtaining a release of David McNair from the state court lawsuits pending against him.

-12-

At the time the instant motion was filed, in March 2010, the deadline for completion of written discovery requests had passed and the discovery completion date was set for May 28, 2010. In the intervening months discovery has turned contentious. As a result the Scheduling Order has been amended to allow discovery to proceed until October 1, 2010. There are currently two motions concerning discovery pending. The continuation of discovery is likely to result in additional evidence and will hopefully lend clarity to the circumstances surrounding settlement of the underlying litigation and the two insurers' respective obligations on their policies. As such the Court finds that the portion of HCI's motion for partial summary judgment seeking a ruling on their cost obligations is premature. Accordingly, it is **DENIED without prejudice**.

## Conclusion

For the reasons explained above, Defendant's motion for partial summary judgment (Doc. 28) is **DENIED**. Insofar as the motion seeks to clarify cost obligations between the parties, the denial is without prejudice. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:  August 2, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE