**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

CHICAGO INSURANCE COMPANY,

               Plaintiff,

v.                                 CIVIL  ACTION  NO.  3:09-0659

HEALTH CARE INDEMNITY, INC.,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Health Care Indemnity, Inc.'s Motion for Summary Judgment (ECF No. 154).  For the reasons set forth below, the Court **GRANTS** the motion.

**I.      Factual Background**

The instant litigation stems from payments made by both Plaintiff Chicago Insurance Company (CIC) and Defendant Health Care Indemnity, Inc. ("HCII") for the defense and indemnity of their mutual insured, David McNair.  McNair worked as an assistant to Dr. John King, who performed surgeries at Putnam General Hospital (PGH).  In 2004, 107 lawsuits were brought in Putnam County alleging, along other things, malpractice by King and McNair in surgeries conducted at PGH in 2002 and 2003 (the "King Litigation").

PGH and Defendant HCII are both wholly-owned subsidiaries of HCA, Inc.  HCII was the insurance provider for PGH and for McNair, as an agent of the hospital, during the King litigation.  Plaintiff CIC provided individual insurance to McNair.  This Court's August 2010 Order (ECF No.

88) determined that neither insurer's coverage of McNair was "excess" to the other, but rather that the policies were both primary policies, to be charged pro rata.

HCII was the first insurer involved in McNair's defense, hiring attorney Tom Hurney to represent McNair in June 2004.  Def.'s Mot. Summ. J, ECF No. 154, Ex. C.  Later, when CIC was put on notice of the claims against its insured, McNair, CIC and HCII agreed to a "50-50 split of fees and expenses" incurred in McNair's defense.  *Id.*, Ex. D.  In May 2007, however, CIC notified HCII that it believed it was only obligated to pay 1/11th of McNair's defense costs.  Pl.'s Mem. P. Summ. J.- Defense Costs, ECF No. 160, Ex. 3.  HCII admits that it did not respond directly to this assertion, but HCII did propose a risk transfer agreement, under which CIC would pay HCII a lump sum to assume all defense and indemnity obligations for McNair.  *Id.*, Ex. 4.  The parties negotiated regarding the risk transfer agreement in the fall of 2007, but HCII ultimately withdrew from discussions and the agreement was not completed.  In December 2007, CIC again notified HCII that it believed its responsibility was limited to 1/11th of the cost of McNair's defense.  *Id.*, Ex. 6.

By early 2008, both insurers were actively pursuing settlement with the plaintiffs in the King litigation.  On February 8, 2008, HCII, through separate counsel, agreed to settle with the 70 King plaintiffs represented by Arden Curry ("Curry Plaintiffs").  On February 15, 2008, HCII notified McNair's attorney, Tom Hurney, of the proposed settlement.  On February 21, 2008, CIC reached a separate agreement to settle with the Curry plaintiffs, and all other plaintiffs, for $2.5 million, releasing McNair from all potential liability in the King litigation.  The parties dispute which settlement was finalized first, and whether the CIC settlement duplicated the HCII settlement as to coverage of McNair.

It is undisputed, however, that before and during the period leading to CIC's settlement, CIC was repeatedly notified of its duty to communicate with HCII regarding any settlement for which it might seek HCII's contribution.  HCII notified Hurney of this requirement several times, as early as April 2007.  *See, e.g.*, Def.'s Mot. for Summ. J., ECF No. 154, Ex. DD (letter from HCII counsel to Hurney).  Hurney in turn made HCII's position clear to CIC.  *See, e.g.*, *id*. Ex. FF (Hurney's November 2007 pretrial report to CIC, noting that "McNair has obligations to HCI, particularly not to settle cases without permission.").  However, CIC puts forth no evidence that it made any attempt to secure HCII's participation in its settlement process.  Instead, the evidence demonstrates that CIC simply decided to "deal separately with HCII" after the settlement in the King litigation was completed.  *See, e.g.*, *id*., Ex. GG (February 20, 2008 email from CIC Senior Vice President Veldhuis directing CIC attorneys to "focus on getting all claims resolved on behalf of McNair [. . . ]and CIC can deal separately with HCI on any other outstanding issue."); *id*. (email from CIC counsel Jim Varner to CIC personnel stating "[I]t was never the contemplation in my mind that HCI would contribute to the 2.5m CIC offer[. . . ]").  By March of 2008, CIC's coverage counsel, Jim Murray, was reminding CIC personnel that they had failed to include HCII in the settlement process, and in doing so, jeopardized any claim for contribution.  *Id*., Ex. BB (email from Murray to CIC personnel, stating "additional action would need to be immediately taken" to create a claim against HCII for contribution to the settlement.); *see also id*., Ex. AA (email from Murray to CIC personnel).  Although Plaintiff argues that these communications were merely internal strategy discussions, Plaintiff presents no evidence whatsoever that it somehow involved HCII in the settlement process or settlement finalization after repeatedly and knowingly declining to do so.

The insurers' dispute over McNair's defense and settlement costs did not end with the King litigation.  In June 2009, CIC filed a Complaint for Declaratory Judgment and Other Relief in this Court.  Complaint, ECF No. 1.  The Complaint seeks a finding that HCII is responsible for 10/11ths of McNair's total defense and settlement costs.  It also asks the Court to order HCII to compensate CIC for all settlement and defense payments made in excess of its alleged 1/11ths pro rata share.  Extensive litigation ensued.  On August 2, 2010, this Court issued an order denying without prejudice Defendant's Motion for Partial Summary Judgment, ECF No. 28, which sought a specific declaration of the costs to be borne by each party.  ECF No. 88.  The Court determined that the CIC and HCII policies at issue provided for a pro rata distribution of costs, but that the costs could only be allocated after additional discovery.  *Id*.  Discovery proceeded and the parties have now filed several dispositive motions.  Defendant filed a Motion for Summary Judgment (ECF No. 154), and Plaintiff filed several motions for partial summary judgment (ECF Nos. 159, 161, 163, 165).  Additionally, Defendant filed a motion to disqualify Plaintiff's Counsel (ECF No. 176).  Consistent with this written memorandum opinion and order, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 154), and **DENIES** Plaintiff's motions for partial summary judgment (ECF Nos. 159, 161, 163, 165).  The Court **DENIES as moot** Plaintiff's motion to disqualify (ECF No. 176).

## II.    Defendant's Motion for Summary Judgment

Defendant's Motion for Summary Judgment (ECF No. 154) argues that summary judgment must be granted denying Plaintiff recovery of any of the defense or settlement costs Plaintiff expended on McNair's behalf in the King litigation.  Defendant argues that Plaintiff agreed to split defense costs 50/50 in 2005, and did not successfully modify that agreement at any time during the

-4-

litigation.  Defendant also argues that Plaintiff may not seek contribution toward its settlement costs because the settlement was made without adequate notice to, or participation by, Defendant.

## A.    Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Fed. R. Civ. P.* 56(a).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]"  *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.  Here, Plaintiff CIC fails to meet even that slight burden.

## B.    Analysis

The parties' arguments regarding defense costs and settlement costs raise different issues and will be addressed in sequence.

1.      **Defense Costs**

Plaintiff CIC seeks reimbursement of all payments made toward McNair's defense beyond its claimed 1/11th pro rata share of the total defense costs.  Complaint, ECF No. 1, at ¶ 48; Pl.'s Mot. P. Summ. J.- Defense Costs, ECF No. 159.  Defendant HCII moves for summary judgment on this claim, arguing that the parties agreed to split the costs of defending McNair 50/50, and that such an explicit agreement does not leave any "mutually obligated costs" to split pro rata.  Def.'s Mot. Summ. J., ECF No. 154, at 20.

The agreement at issue is an agreement reached in early 2005 by Todd Hagemeyer, principal claim handler at HCII, and Jennifer Burrell, an adjuster at CIC.  Burrell and Hagemeyer apparently made an oral agreement to split McNair's defense costs 50/50, an agreement confirmed in a February 4, 2005, email from Hagemeyer to Tom Hurney, McNair's defense attorney, copying Burrell.  Def.'s Mot. Summ. J., ECF No. 154, Ex. D.  The parties do not dispute that Burrell and Hagemeyer did agree to split costs 50/50.  Plaintiff now argues, however, that the agreement was not a valid and binding contract, and should not control the ultimate cost allocation between insurers.

Plaintiff's position is untenable.  As Defendant argues, the Hagemeyer-Burrell agreement was a binding contract, one Plaintiff performed under for more than two years before stating any position that the contribution should be other than 50/50.  Further, any attempted modification of the contract was unsuccessful because CIC offered no consideration for any modification, and HCII did not agree to any modification.  Plaintiff apparently contends that it sought modification by sending several communications to HCII after May of 2007, asserting that CIC's share of costs should be 1/11th, not 50%, of McNair's defense costs.  HCII did not respond directly to CIC's

assertion that its share of costs should be 1/11th, but did propose, then withdraw, a risk transfer agreement.  *See*  Pl.'s Mem. P. Summ. J.- Defense Costs, ECF No. 160, at 6; *id*., Ex. 4.  Although Plaintiff makes much of the fact that HCII "never responded, objected, disputed, or disagreed with" Plaintiff's asserted allocation of costs, *see* ECF No. 160, at 3, silence on HCII's part was by no means consent to Plaintiff's asserted position.  *See Quincy Dairy Co*. *v. Hartford Accident & Indem*. *Co.*, 57 F. Supp. 899, 930 (S.D.W. Va. 1944).

In fact, Plaintiff's only response to Defendant's contract argument is the unsupported assertion that no contract was actually formed in February 2005 because there was no "meeting of the minds" between the parties.  Pl.'s Reply, ECF No. 172, at 2.  Plaintiff argues that CIC representative Jennifer Burrell did not have the full HCII policy in her possession at the time the 50/50 split was designed.  As evidence, Plaintiff puts forth the abridged- version of the HCII policy which was provided to Burrell in an e-mail attachment.  See Pl.'s Reply, ECF No. 172, at 2.  By comparison, the full HCII policy (HCI-10102) is around 60 pages in length.  Def.'s Mot. Summ. J., ECF No. 154, Ex. 2.  At oral argument, Plaintiff's counsel attempted to explain that Burrell authorized a 50/50 split as an initial agreement, and when Plaintiff's coverage specialists looked at the full HCII policy, they determined that the appropriate split was 1/11th and 10/11ths, not 50/50.

Such an explanation does not assist Plaintiff's cause, however, because Plaintiff fails to give any reason that the abridged policy somehow negates Burrell's consent to the 50/50 split.  Burrell was an authorized agent of CIC, she agreed to the 50/50 split, and neither party advances any evidence that the split was meant to be temporary.  Under Plaintiff's own suggested authority on the formation of an oral contract, an oral contract was formed in this case.  "Where parties intend to conclude an agreement, the parameters of their agreement must be established.  Evidence of their

agreement is found in the language, conduct, and totality of relevant surrounding circumstances including trade usage, prior course of dealing, and course of performance."  Pl.'s Reply, ECF No. 172, at 2 (quoting John Murray, *Murray on Contracts* 424 (4th ed. 2001)).

This standard illustrates what CIC could have done, but did not do, in order to avoid a binding 50/50 split.  Had Burrell specified that the agreement was temporary pending CIC's full investigation of the policies, the extent of the agreement might be called into question.  Had Plaintiff not waited two years to request a different cost allocation, the course of performance might not confirm a binding contract.  Had Plaintiff explained, even during this litigation, exactly what information was missing from the shorter HCII policy provided in early 2005 that rendered it an insufficient basis for an agreement about cost-sharing, there could be some reason to believe no true agreement had been made.  Had Plaintiff put forth evidence about trade usage or course of dealing, in this case, some evidence that preliminary 50/50 splits pending formal cost-splitting are common practice in multiple-insurer scenarios, that might provide further evidence against the existence of a binding contract to split costs.  However, Plaintiff put forth no such evidence, and Defendant's Rule 30(b)(6) witness, Larraine Gerelick, testified that there is no such standard practice in the insurance industry.  See Pl.'s Reply, ECF No. 172, Ex. 2, at 63.[1]  Therefore, even viewing the facts in the light most favorable to the Plaintiff, there is no material issue of disputed fact.  The parties' agreement to split McNair's defense costs 50/50 was a binding agreement that was neither modified

---

[1] Plaintiff did submit an expert deposition.  ECF No. 172, Ex. 5 (Dep. of Tom Segalla). Plaintiff argues that Segalla "could not confirm there was a 'meeting of the minds' with respect to the splitting of attorneys fees and costs in this litigation."  ECF No. 172 at 4.  However, that Segalla "could not confirm" a meeting of the minds does not create a contested issue of fact, as contract formation is a legal, and not factual, question.

nor limited.  Defendant does not, therefore, owe Plaintiff any contribution toward its already-paid 50% share of McNair's defense costs.

A necessary implication of this conclusion is that the defense costs paid by CIC and HCII under the 50/50 agreement are not "mutually obligated" costs to be split pro rata under this Court's August 2, 2010 Order.  ECF No. 88.  The Court has now found that CIC and HCII had an independent and enforceable agreement to split defense costs 50/50, not tied to the extent of their policies covering McNair, and that agreement governs the defense costs.  Therefore, the defense costs are not "mutually obligated" costs to be split pro rata, but are instead already allocated by the parties' agreement.

## 2.    **Settlement Contribution**

Plaintiff also seeks a declaratory judgment that Defendant owes Plaintiff reimbursement for part of the $2.5 million dollars Plaintiff paid in settlement of the King litigation on McNair's behalf in February 2008.  The parties appear to agree that settlement costs are not within the February 2005 agreement to split costs 50/50.  Summary judgment for Defendant is appropriate for two reasons. First, as a contractual matter, the HCII policy covering McNair contains consent-to-settle provisions, requiring that HCII consent to a settlement before the policy provides an insured any coverage for that settlement.  CIC, acting as McNair's subrogee, neither sought nor received such consent. Second, CIC's failure to seek and receive HCII's consent also invalidates any claim for contribution under equitable principles and West Virginia law.  CIC was required to provide HCII with advance notice of the proposed settlement, and a chance to participate with CIC in the settlement process, if it desired to hold HCII responsible for any portion of the settlement.  *See generally* Def.'s Mem. in Supp. Mot. Summ. J., ECF No. 155, at 12-14.

### a.      Subrogation

These issues require the Court to characterize the parties' relationship.  The parties are mutual insurers of David McNair.  Other than any contractual agreements regarding their mutual obligation to McNair, like the fee split noted above, they are not contractually obligated toward one another in the same way that an insurer and an insured are contractually obligated under the applicable insurance contract.  However, liability insurers may enjoy a right of subrogation as to their insured, which allows them to exercise any rights against a third party that the insured would have been able to exercise.  "The doctrine of subrogation is that one who has the right to pay, and does pay, a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other."  *Barth v. Keffer*, 464 S.E.2d 570 (W. Va. 1990) (quoting *Bassett v. Streight*, 88 S.E. 848, Syl. Pt. 1 (W. Va. 1916)).  As McNair's subrogee, then, Plaintiff can assert against Defendant any rights which McNair could have asserted against Defendant– namely, payment toward the $2.5 million settlement of the claims against McNair. Plaintiff and Defendant agree that Plaintiff may act as McNair's subrogee in this matter.  Complaint, ECF No. 1, at ¶38; Def.'s Mem., ECF No. 155, 12 at n. 6.  *Cf. Am. Indemn. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d. 429, 435-36 (5th Cir. 2003) (applying Texas law) (" . . . such recovery is not based on the theory that the separate policies create any contract between the two insurance companies issuing them to a common insured, nor upon common law contribution, but rather upon conventional or equitable subrogation to the rights of the common insured against the nonpaying insurer.").  Any contract terms in the HCII policy controlling McNair's rights under that policy, such as the consent-to-settle provisions at issue here, apply to CIC as McNair's subrogee as they would to McNair himself.

-10-

**b.      Consent to Settle**

The HCII policy covering McNair contains "consent-to-settle" provisions, requiring that

HCII agree to any settlement for which it may be responsible, including:

> "[The insured] shall not, except at his own cost, voluntarily make any payment,
> assume any obligation, or incur any expense."  Def.'s Mot. Summ. J., ECF No. 154,
> Ex. A ("HCII Policy"), Condition VI(4).

> and,

> "No Action shall lie against [HCII] unless, as a condition precedent thereto, there
> shall have been full compliance with all the terms of this policy, nor until the amount
> of the Insured's obligation to pay shall have been finally determined either by
> judgment against the Insured after actual trial or by written agreement of the Insured,
> the claimant, and the Company."  *Id.,* Sec. VI(5).

These clauses applying to the "insured" also apply to Plaintiff as McNair's subrogee.

Additionally, Defendant points to at several communications produced during discovery indicating

that Plaintiff was aware of these clauses.  *See* Def.'s Mem. in Supp. Mot. Summ. J., ECF No. 155,

at 13; *id.*, Exs. AA-FF.

West Virginia recognizes and enforces consent-to-settle provisions.  *Arndt v. Burdette*, 434

S.E.2d 394, 401 (W. Va. 1993).  Although Plaintiff argues that consent-to-settle provisions are only

enforceable in the context of underinsured motorist insurance (UIM), an area of insurance not at

issue in this case, there is no reason to so limit the use of consent-to-settle provisions.  The consent-

to-settle provisions in the HCII policy are enforceable and forbid CIC's recovery of settlement costs.

First, absent any particular reason in law or equity to ignore a specific term in a liability

insurance policy, West Virginia law requires the Court to enforce the policy as written.  *Arndt*, the

same case Plaintiff relies on to assert that consent-to-settle provisions are only enforceable in UIM

-11-

insurance, states this proposition clearly: it is "well-established law" in West Virginia that "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." *Arndt*, 189 W. Va. at 727 (quoting *Keffer v. Prudential Ins. Co.*, 172 S.E.2d 714 (1970) (a medical insurance case)). Plaintiff cites neither case nor statute for the proposition that consent-to-settle provisions are impermissible contract terms, or permissible only in UIM insurance. *Cf. Kronjaeger v. Buckeye Union Ins. Co.*, 490 S.E.2d 657, 667 (W. Va. 1997) (recognizing "the authority of an insurer to draft a policy of insurance containing specific criteria governing an insured's recovery of benefits under that policy."). Although Plaintiff attempts to frame the issue by arguing that West Virginia has only *accepted* consent-to-settle provisions in the UIM context, *see* Pl.'s Reply, ECF No. 170, at 6, this is unpersuasive, because Plaintiff can point to no case or policy where West Virginia has *rejected* consent-to-settle provisions in other insurance contracts.[2] Following the available guidance on consent-to-settle provisions, set forth in *Arndt*, the Court will give effect to the "plain meaning intended" and enforce the consent-to-settle provision.

Second, Plaintiff's attempts to distinguish *Arndt* based on differences between UIM insurance and other liability insurance fail. Although *Arndt* did specifically consider UIM

---

[2] Plaintiff attempts that *Kronjaeger v. Buckeye Union Insurance Co.* limits the validity of consent-to-settle clauses. 490 S.E.2d 657 (W. Va. 1997). In *Kronjaeger*, the court held that a UIM insurer may invalidate a policy based on an insured's noncompliance with the consent-to-settle clause, where the insured had settled for the full amount of the tortfeasor's policy, only when it can demonstrate prejudice from the settlement. *Id.* at 671. *Kronjaeger* addresses the specifics of proceeding with a consent-to-settle suit in the UIM context, however, and makes no effort to establish a limiting rule on consent-to-settle clauses outside the particular context of a UIM insured who has settled for the full amount of the tortfeasor's policy without the insurer's consent. *Id.* (labeling the *Kronjaeger* limitation on consent-to-settle clauses a "slight deviation" from prior cases holding that consent-to-settle clauses are legitimate protectors of an insurer's subrogation rights).

insurance, an insurance product regulated by statute in West Virginia,[3] nothing in *Arndt* limits consent-to-settle clauses to UIM insurance policies. UIM coverage provides that if an insured is experiences a loss from an under- or uninsured motorist, the insurer providing UIM coverage will cover any remaining costs. The insured's claim against the underinsured tortfeasor is then subrogated to the insurer. Therefore, in the UIM context, consent-to-settle provisions protect the insurer's rights, as subrogee, to pursue claims against the tortfeasor, and also to protect itself against "possible collusion between insured and tortfeasor." *Arndt*, 434 S.E.2d 394 (citing *Lambert v. State Farm Mut. Ins. Co.*, 576 So.2d 160, 164 (Ala. 1991)). Although subrogation rights in UIM insurance are statutory, rather than general, their protections are similar to the general subrogation rights at issue in this case. *See Barth v. Keffer*, 464 S.E.2d 570, 573-74 (W. Va. 1995) ("[W]e conclude that the statutory subrogation right contained in [the UIM statute] ordinarily precludes an injured party from settling for less than the liability policy limits of the tortfeasor and giving a general release without the consent of the underinsured motorist carrier that has coverage for the injured party. *This statutory subrogation rule is consistent with general liability insurance law relating to subrogation principles*.") (emphasis added) (citing *Fed. Kemper Ins. Co. v. Arnold*, 183 W.Va. 31, 393 S.E.2d 669 (1990) (medical and funeral insurance); and *Runner v. Calvert Fire Ins. Co.*, 138 W.Va. 369, 76 S.E.2d 244 (1953) (automobile collision insurance)). Plaintiff offers no reason that HCII should have less ability than an UIM insurer to control its exposure in settlement by including consent-to-settlement terms in its insurance policy. The Court therefore finds that the HCII's consent-to-settle requirements apply against any claim for contribution toward settlement

---

[3] W. Va. Code § 33-6-31 *et seq*.

by CIC.  The parties do not dispute that CIC did not formally put HCII on notice of the settlement, much less seek its consent, so the consent-to-settle clauses prohibit any recovery by CIC from HCII for the $2.5 million settlement.

### c.      Equitable Contribution

Alternatively, and outside of any subrogation analysis, Plaintiff's recovery of settlement costs from Defendant is prohibited by the doctrine of equitable contribution.  Claims by one co-insurer against another have been characterized in many different ways.  In this district, Chief Judge Goodwin pointed out in *Executive Risk Indemnity, Inc., v. Charleston Area Medical Center*, 641 F. 2d 694, (S.D.W. Va. 2009), that where two insurers cover the same risk and same insured and one pays the claim, equitable contribution permits the paying insurer to seek contribution from the non-paying insurer.  *See, e.g.*, *Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 211 (2d. Cir. 2000) (applying New York law) ("The contract of settlement an insurer enters into with the insured cannot affect the rights of another insurer who is not a party to it.  Instead, whatever obligations or rights to contribution may exist between two or more insurers of the same event flow from equitable principles."); *Am. Emp'r. Ins. Co. v. Md. Cas. Co.*, 218 F. 2d 335, 340 (4th Cir. 1955) ("The right to contribution here invoked is not dependent on contract or joint action or original relationship between the parties.  It is based on principles of fundamental justice and equity.").  Other courts have acknowledged a similar right but based it on differing principles, including subrogation, contribution, or indemnification.  *See Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 77 Cal. Rptr. 2d 296, 300-1 (Cal. Ct. App. 1998).

Some courts treat the insurer's claim as equitable subrogation, which places the insurer in the shoes of the insured to pursue contributions from another insurer.  Other courts find the claim

arises under equitable contribution principles, not derived from and independent of any subrogation rights. *Am. Cas. Co. of Reading Pa. v. Health Care Indem., Inc.*, 520 F. 3d 1131, 1139 (10th Cir. 2008); *Fireman's Fund*, 77 Cal. Rptr. 2d at 300-1. Under both approaches, courts consistently require that an insurer seeking contribution after settling must have provided notice and an opportunity to participate to the other insurer. *Cont'l Cas. Co. v. St. Paul Surplus Lines Ins. Co.*, 2:07-cv-01744, 2011 U.S. Dist. LEXIS 29650 at*24 (E.D. Cal. Mar. 22, 2011) ("no action" clause, similar to HCII's coverage here, was inapplicable to bar contribution because non-settling insurer refused to participate in settlement process despite prior notice and invitation to do so); *Guidant Mut. Ins. Co. v. Indem. Ins. Co. of N. Am.*, 13 So. 3d 1270 (Miss. 2009) (facts clear that insurer's refusal to participate in settlement discussions permitted settling insurer to pursue equitable contribution); *Lumbermens Mutual Cas. Co. v. Foremost Ins. Co.*, 425 So. 2d 1158, 1159-60 (Fla. Dist. Ct. App. 1983) (failure to preserve claim for contribution, subrogation, or indemnity against other insurer defeats claim for contribution). These cases establish that an insurer who pays all of a loss rightfully shared by another insurer has an equitable claim for reimbursement, whether characterized as subrogation, contribution or indemnity. However, the right to equitable contribution or subrogation arising from a settlement requires notice and an opportunity to participate be afforded the other insurer. *Cf. Continental Cas. Co.*, 2011 U.S. Dist. LEXIS 29650 at*24 (contribution could be sought against a co-insurer who was twice invited, but declined, to participate in the mediation leading to settlement). Plaintiff provided Defendant neither notice nor opportunity to participate in its McNair settlement, and is thus barred by the doctrine of equitable contribution from now seeking the contribution that it failed to pursue before or during settlement.

*Charleston Area Medical Center, Inc. v. Parke-Davis*, 614 S.E.2d 15 (W. Va. 2005) supports this result. *Parke-Davis* addressed whether a tortfeasor could seek contribution toward a settlement from a joint tortfeasor who had not been involved in that settlement. The West Virginia Supreme Court of Appeals held that there was no "right of contribution by a settling tortfeasor against another tortfeasor who was not involved in the settlement agreement and not a party to any action initiated by the injured party." *Id*. at 19. Although *Parke-Davis* concerned joint tortfeasor contribution rather than equitable contribution between co-insurers, it supports the application of equitable contribution to bar Plaintiff's claim for settlement contribution in this matter.

First, ready broadly, *Parke-Davis* supports the proposition that where there are two mutual *obligors* to a settlement, both must consent in order to bear joint responsibility for its payment. This reading of *Parke-Davis* is consistent with West Virginia law, which holds that mutual obligors in contract, not just joint tortfeasors, are subject to the equitable principle of contribution. *See Sydenstricker v. Unipunch Prods., Inc.*, 288 S.E.2d 511, Syl. Pt. 4. (W. Va. 1984) ("The doctrine of contribution has its roots in equitable principles. The right to contribution arises when persons having a common obligation, either in contract or tort, are sued on that obligation and one party is forced to pay more than his pro tanto share of the obligation."). *Cf. Estate of Bayliss by Bowles v. Lee,* 315 S.E.2d 406, 410 (W. Va. 1984) (applying *Sydenstricker* to co-obligors on a note, rather than joint tortfeasors).

Second, *Parke-Davis* is applicable to this matter because it directs that it is inequitable to allow one party to control the process and terms of settlement, then claim contribution toward that settlement from another. 614 S.E.2d at 24. "[T]here is no assurance that principles of fairness and equity will be advanced if one settling party can affect the amount of settlement independent of other

-16-

tortfeasors and then seek to make those non-involved tortfeasors contribute to the settlement that it voluntarily undertook to pay." *Id.* Equity likewise demands notice and participation when the potentially liable parties are co-insurers rather than joint tortfeasors.

The present litigation illustrates the reasons for such a rule. The parties argue strenuously about several aspects of the settlements made in the King litigation: whether either party knew of the other's attempts to reach settlement, whether the HCII settlement fully covered McNair, and whether Plaintiff was obligated by its duty to McNair to settle with some plaintiffs despite HCII's nonparticipation. Such confusion about the scope and dates of the settlements demonstrates that equity demands some form of notice or participation to a potential obligor before a settlement is made, if that obligor is to be responsible for any of the settlement. Not only does a lack of notice prejudice a potential obligor's ability to protect its interests and limit its financial obligations, but it also means that joint obligors may fail to communicate, may agree to duplicative settlements, and may end up, as in this case, litigating their respective obligations. *Cf. Parke-Davis*, 614 S.E.2d at 24.

Contractual subrogation and equitable contribution are different legal concepts, but lead to the same result in this case: Plaintiff may not force Defendant to contribute to a settlement, when Defendant did not have substantial notice of the settlement nor participate in the settlement process. Although exceptions to this rule may exist: for example, if an obligor unreasonably refuses to participate in settlement, *cf. Shamblin v. Nationwide Mut. Ins. Co.*, 396 S.E.3d 766 (W. Va. 1990), Plaintiff can point to no such exception in this case. Plaintiff CIC fails to establish a material issue of disputed fact that it either put Defendant HCII on notice of the forthcoming settlement, or sought Defendant's participation in the settlement process. The Court **GRANTS** summary judgment to the

-17-

Defendant on Plaintiff's claim for reimbursement toward its 2008 $2.5 million settlement on McNair's behalf.  Because the Court finds that the above analysis decides this issue, it will not address the waiver and selective tender arguments put forth by the parties.

**III.    Conclusion**

As a result of the Court's summary judgment for Defendant, the parties bear no financial obligation toward one another outside the sums already expended on McNair's behalf.  Therefore, the Court need not address the many other questions raised in briefing, particularly the parties' proportional liability and the limits of the parties' insurance policies.  Consistent with this Memorandum Opinion and Order, The Court **GRANTS** summary judgment for the Defendant HCII on all counts in the Complaint.  The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        January 31, 2012

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE